**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION**

UNITED STATES OF AMERICA

      Plaintiff,

v.                             No. 1:22-cr-10007-MSN

CHARLES E. PETTIGREW,

      Defendant.

---

## REPORT AND RECOMMENDATION

---

Before the Court is the question of whether a search warrant should be suppressed based on Defendant's argument that law enforcement knowingly, intentionally, or recklessly included false statements or material omissions in a search warrant and supporting affidavit, and that those statements were necessary to the finding of probable cause. (D.E. 129.) The District Court referred the Motion to Suppress to the undersigned for report and recommendation. (D.E. 130.) The Government filed a Response to the Motion, and the Court held a hearing. (D.E. 137, 138.) Based on the following facts and analysis, the undersigned **RECOMMENDS GRANTING** the Motion to Suppress.

### I. BACKGROUND

**A. The Search Warrant and Supporting Affidavit as Presented**

In the early morning hours of July 8, 2020—4:45 AM to be exact—a part-time Tennessee state juvenile court judge signed a search warrant to enter the home of Charles Pettigrew III. (D.E. 129-2 at 1.) The search warrant was executed the same day by the law enforcement officer who submitted the warrant and affidavit, Special Agent (SA) Williams. (D.E. 129-2 at 1.)

The first page of the search warrant identified, via a hand-written note, Mr. Charles Pettigrew as the person "presently in possession" of "evidence of a crime" at "4065 West Van Hook, Milan, Tennessee 38358[.]" (D.E. 129-2 at 1.) The warrant sought authorization to search "the residence, persons, all outbuildings, and vehicles" at the West Van Hook address for items "includ[ing] but not limited to . . . illegal drugs, and drug paraphernalia and US Currency, receipts, notes, ledgers, books, records and/or computerized records, cell phones, and all other material evidence of violations of" Tennessee state law. (D.E. 129-2 at 1.) It is necessary to lay out the exact details SA Williams included in paragraph four of the supporting affidavit:

> A. Your Affiant states that within the past 72 hours of the swearing of this affidavit Your Affiant along with other Agents of the Drug Task Force conducted a purchase of methamphetamine from Charles Pettigrew 3rd at 4065 West Van Hook Street . . . by utilizing a confidential source, hereafter referred to as CS, and an unwitting party identified as Dylan Huey.

> B. Prior to the purchase of methamphetamine Agents met up with the CS and searched the CS and the CS vehicle for any narcotics, money, or paraphernalia with none being found. The CS was provided with $200.00 in buy money that was recorded by Your Affiant. Agents conducted surveillance on the CS's vehicle prior to the purchase, during the purchase, and after the purchase of methamphetamine. The CS drove to an address in Trenton, TN where Dylan Huey got into the vehicle with the CS. Dylan Huey advised the CS that he could purchase the methamphetamine for the CS, but it would be at another location in Milan, TN. The CS contacted Agent Jackson and advised that [s]aid CS and Huey were going to purchase the methamphetamine from Charles Pettigrew at 4065 West Van Hook Street. . . . Agents observed CS's vehicle go to the residence and Huey enter the residence. A short time later Huey exited the residence and returned to the CS's vehicle. The CS and Huey then left the residence and drove directly to the [B]udget [I]nn. Agents conducted a traffic stop on the vehicle and contacted Huey and said CS. Agents conducted a search of Huey and in his right pants pocket was a baggy of methamphetamine that weighed 3.5 grams and did field test positive. Agents recovered a second baggy of methamphetamine from the CS, who advised that Huey gave said CS the baggy of methamphetamine. That baggy weighed 3.5 grams. This CS also stated to Agents that Charles Pettigrew came out to her vehicle after he made the deal with Mr. Huey and stated to her to holler at him tomorrow if this CS needed any more that he was good now, that he was out earlier.

C. Agents conducted a search of the CS and vehicle for any narcotics, money, or paraphernalia with none being found. CS stated that Huey purchased the methamphetamine from Charles Pettigrew. Your Affiant advised Dylan Huey of his Miranda rights and Agent Jackson asked Huey where he purchased the methamphetamine from. Huey stated that he did purchase the methamphetamine from Charles Pettigrew at the residence located at 4065 West Van Hook Street . . . . Huey also stated that he also [sic] gave the CS the baggy of methamphetamine[.]

D. Agents with the Drug Task Force have received multiple tips from other law enforcement and unreliable confidential sources about Charles Pettigrew selling methamphetamine in Milan, TN.

E. Your Affiant conducted a check of Tennessee Offender Management Information System (TOMIS) and found that Charles Pettigrew has been convicted of multiple felonies that include Schedule II drugs on 01/01/1994, Schedule II drugs on 07/20/1997, Schedule II Drugs (meth) on 12/05/2017 all out of Gibson County, TN. Pettigrew also has two felony convictions out of New Mexico for Aggravated Assaults with a weapon on 05/03/2014.

(D.E. 129-2 at ¶ 4(A) – (E).)

In his Motion to Suppress, Defendant argues that "[t]his search warrant is based on a sworn affidavit submitted by Special Agent Jason Williams that contains inaccuracies, and false and/or misleading statements to the extent that there is virtually no . . . basis for probable cause for the warrant if appropriately" supplemented. (D.E. 129-2 at 2.) At this point, the Court notes that there are two categories of issues Defendant raises with SA Williams's affidavit. The first is what the Government categorizes as scrivener's errors. (D.E. 137 at 12.) The second category is what may be described as material omissions. Because the Court agrees with the Government that many of the errors raised by Defendant regarding blatant inaccuracies are likely clerical or editorial errors (as opposed to falsities), it will instead focus on the issue of material omissions.[1]

---

[1] There are several incorrect statements of fact, and inconsistencies, about rather crucial details that certainly give the Court concern. First, SA Williams failed to include the *proper name* of the person under investigation. The third and fourth line of the search warrant identifies a completely different person, their gender and ethnicity, date of birth, and social security number. (D.E. 129-2 at 1.) Because of this, there is a hand-written note in the top right corner of the search warrant that reads "Search warrant needs to be amended from [another person] to Charles Pettigrew[.]" (D.E. 129-2 at 1.)

### B. Information Omitted from the Search Warrant and Supporting Affidavit

At the suppression hearing, the CS, SA Williams testified, and Defense counsel's investigator testified. Through the course of their testimony, the Court heard key pieces of information and events that were *not* included in the supporting affidavit. The information and sequence of events not presented to the judge who signed the warrant are as follows.[2]

Somewhere between July 7, 2020, and July 8, 2020, the CS—an admitted heavy drug user at the time—was a passenger in a vehicle that was pulled over. (Tr. 12, ¶ 19; 13, ¶ 4; 68, ¶¶ 10-14.) A search of her person revealed she was in possession of illegal drugs. (Tr. 13 ¶¶ 4-14; 68, ¶¶ 13-14.) Both the CS and SA Williams confirm that for her cooperation as a confidential source, law enforcement agreed to either let the CS go or offered her a reduced charge. (Tr. 14, ¶¶ 10-13; 68, ¶¶ 15-17.) On the *same* day that law enforcement stopped the CS and found her in possession of illegal substances, she was deployed in the field. (Tr. 68, ¶¶ 15-17.) This was her first experience working as a confidential source and the "first time [SA Williams] had ever met" her. (Tr. 24, ¶¶ 16-18, 68, ¶¶ 15-17; 79, ¶¶ 22-23.)

---

Second, SA William's affidavit includes details about his training and experience that focuses significantly on electronic devices and communications as it relates to the sale of marijuana as opposed to the likelihood of evidence of methamphetamine distribution being in a home. (D.E. 129-2 at ¶¶ 1-2.) The Court reads this section of the affidavit as supporting a previously submitted warrant seeking access to a suspect's electronic devices for evidence of marijuana distribution.

Finally, the third paragraph of the affidavit lists the address to be searched as 2232 Dodson Street, Humboldt, Tennessee 38343. (D.E. 129-2 at ¶ 3.) This address is inconsistent with the address SA Williams listed elsewhere in the warrant and affidavit as Defendant's alleged home.

Again, the Court is bothered by these errors. Incorrectly listing the person and address to be searched is significant. However, the Court will credit SA Williams's testimony that the incorrect name and address were "clear mistake[s] on [his] part." (Tr. 82 at ¶ 14.) Because the warrant and affidavit later included Defendant's name and the correct intended address to be searched, the Court does not find these errors to be deliberate falsehoods.

[2] The Court notes here that there were discrepancies between the CS's testimony and SA Williams's testimony at the suppression hearing. The Court will focus its analysis, and therefore factual recitation, on those events and omissions upon which the CS and SA Williams agree. Significant discrepancies will be outlined in footnotes, but not considered in the Court's conclusion regarding suppression.

At some point while in the immediate vicinity of law enforcement, the CS spoke on the phone with Mr. Dylan Huey. (Tr. 13, ¶¶ 17-25; p. 71, ¶¶ 16-23.) The CS testified that Mr. Huey wanted her "to take him to get drugs." (Tr. p. 14, ¶¶ 7-9.) SA Williams testified that "Dylan Huey advised he would sell [the CS] methamphetamine." (Tr. p. 71, ¶¶ 22-23.) SA Williams's testified the intended target for the CS's activities that day was not the Defendant—*it was Mr. Huey*. (Tr. 15, ¶¶ 18-19; 77, ¶ 10-13.)

After the CS obtained her own vehicle, law enforcement searched the CS and her car. (Tr. 15, ¶¶ 8-22; Tr. 71, ¶¶ 24-25.) She was given $200 in buy money and was directed to pick Mr. Huey up. (Tr. 71, ¶ 25; Tr. 15, ¶¶ 8-22; Tr. 72, ¶¶ 1-3.) The CS picked Mr. Huey up, and at some point, gave him the buy money. (Tr. 28, ¶¶ 11-23.)

The pair then went to Mr. Huey's grandparent's house "and stayed there for quite a few hours" or "several hours."[3] (Tr. 15, ¶¶ 23-24; 72, ¶¶ 4-11.) Mr. Huey "did go in" his grandparent's home. (Tr. 72, ¶¶ 12-13.) SA Williams testified that they waited "so long" at Mr. Huey's grandparent's house that they were prepared to abandon the day's operations. (Tr. 72, ¶¶ 17-20.) Nevertheless, law enforcement persisted.

---

[3] SA Williams testified that the CS *never* went into Mr. Huey's grandparent's home and that law enforcement had constant surveillance of her. (Tr. 72, ¶¶ 9-13.) The CS, however, testified that she was "positive" she did enter the home. (Tr. 15, ¶¶ 21-24; 18, ¶¶ 23-25.) The Court notes that the CS admitted to having been under the influence that day and therefore, could likely be incorrectly remembering some events. (Tr. 18, ¶ 19; 19, ¶¶ 3-5; 28, ¶¶ 4-7.) While this discrepancy is notable, what is most important before the Court at this time is that both the CS and SA Williams agree that *Mr. Huey* left the observable area and entered his grandparent's home. (Tr. 15, ¶¶ 21-24; 16, ¶¶ 14-21; 72, ¶¶ 12-13.)

The CS testified that she used drugs during the course of these events. (Tr. 18, ¶ 17; 18, ¶¶ 8-9.) She stated that after being pulled over with Mr. Huey, a law enforcement officer said something to the effect of, "we seen you do a line. You wasn't supposed to do that." (Tr. 21, ¶ 25; 22 ¶ 1.) When asked if he "suspected that they were getting high or were high" during the day's events, SA Williams testified "No, sir. I didn't think they had any dope." (Tr. 103, ¶¶ 1-3.)

After leaving Mr. Huey's grandparents' home, the CS and Mr. Huey went to the 4065 West Van Hook Street address.[4] (Tr. 19, ¶¶ 23-25.) Law enforcement parked "across the street" with "just a grass field" between their car and the "trailer in question." (Tr. 74, ¶¶ 24-25, 75, ¶¶ 2-4.) Mr. Huey entered the home for a brief period; the CS remained outside. (Tr. 19, ¶¶ 24-25; 29, ¶¶ 8-10; 78, ¶¶ 15-16; 79, ¶ 1.) At some point, Defendant came out to the car and spoke briefly to the CS prior to the CS and Mr. Huey leaving the West Van Hook location.[5] (Tr. 24, ¶¶ 7-14; 86, ¶¶ 13-21.) This all took place in the "wee early morning hours" of July 8, 2024. (Tr. 78, ¶ 22.)

The CS was instructed to go to the Budget Inn in Milan, Tennessee with Mr. Huey upon completion of the buy at the West Van Hook address. (Tr. 79, ¶¶ 4-8.) Once law enforcement stopped the pair at that location, SA Williams spoke with the CS. (Tr. 83, ¶ 6.) She was in the passenger seat and handed "three and a half gram[s] of methamphetamine" to him. (Tr. 83, ¶¶ 6-8.) The CS reported that Mr. Huey got the methamphetamine from Defendant, and that Mr. Huey had more methamphetamine on his person. (Tr. 83, ¶¶ 8-12.) Law enforcement searched Mr. Huey and "got approximately three and a half grams of methamphetamine out of his pocket as well." (Tr. 83, ¶¶ 13-15.) Mr. Huey, after being "advised . . . of his rights," told law enforcement he obtained the methamphetamine from Defendant. (Tr. 83, ¶¶ 16-19.) All told, from the time the CS was sent "to do [the] drug buy, until the time [law enforcement] did the takedown," nearly "six, seven, eight hours" had passed. (Tr. 102, ¶¶ 11-14.)

---

[4] The CS also reported going to another house between Mr. Huey's grandparent's home and Defendant's home. (Tr. 17, ¶¶ 23-25, 18, ¶¶ 1-8.) After leaving that location, she reported picking someone else up and dropping them off at a trailer park. (Tr. 19, ¶¶ 10-21.) SA Williams testified that the pair went from Mr. Huey's grandparent's home to Defendant's home, albeit via a circuitous route. (Tr. 74, ¶¶ 1-23.) When asked if the CS "ever pick[ed] up anybody else" after leaving Mr. Huey's grandparents' home, SA Williams testified: "Absolutely not." (Tr. 75, ¶ 8.)

[5] Defense counsel asked SA Williams whether the West Tennessee Drug Task Force has video and audio recording equipment available. (Tr. 92, ¶¶ 17-25; 93, ¶¶ 1-8.) SA Williams said such equipment is available, but he "believe[s]" the equipment "would have went dead [sic] before" the alleged buy took place with Defendant because the day's events were "so long." (Tr. 93, ¶¶ 8-9.)

SA Williams included in his affidavit the following regarding additional information about Defendant and drug sales: "Agents with the Drug Task Force have received multiple tips from other law enforcement and *unreliable* confidential sources about Charles Pettigrew selling methamphetamine in Milan, TN." (D.E. 129-2 at ¶ 4(E) (emphasis added).) On cross examination SA Williams disclosed that those tips came from "officers in Milan" and he "believe[d]" the Tennessee Bureau of Investigations "within that same month or two." (Tr. 98, ¶ 25; 99, ¶¶ 1-2, ¶ 9.) As to the issue of what an "unreliable confidential source means," SA Williams testified that he believed that to mean "more or less like a complaint from somebody" that law enforcement does not know. (Tr. 84, ¶¶ 15-19.)

The Court notes that the affidavit also failed to include information about the CS's veracity, reliability, or basis of knowledge. Additionally, the affidavit failed to include independent corroboration that Defendant lived at the West Van Hook address. SA Williams testified that he saw Defendant exit the trailer at that address "and walk to the [CS's] vehicle," but that information is not included in the affidavit. (Tr. 86, ¶¶ 13-17.)

## II. PROPOSED CONCLUSIONS OF LAW

### A. The *Franks v. Delaware* Standard

Under *Franks v. Delaware*, a "search warrant must be voided" if it, or the supporting affidavit, "knowingly and intentionally, or with reckless disregard for the truth" includes "a false statement," and without the false statement "the affidavit's remaining content is insufficient to establish probable cause . . . ." 438 U.S. 154, 155-56 (1978). The Sixth Circuit held that "the *Franks* doctrine applies to omissions of information from affidavits as well." *Mays v. City of Dayton*, 134 F.3d 809, 815 (6th Cir. 1998) (citing *United States v. Bonds*, 12 F.3d 540, 568-69 (6th Cir. 1993)); *see also United States v. Atkin*, 107 F.3d 1213, 1217 (6th Cir. 1997). Challenges to the

sufficiency of a warrant or an affidavit under *Franks* must be "specific" and supported by "an offer of proof." *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990).

To be entitled to a *Franks* hearing, a defendant must make a "preliminary showing that the government affiant engaged in 'deliberate falsehood' or 'reckless disregard for the truth' in omitting the information from the affidavit[.]"[6] *Atkin*, 107 F.3d at 1217. Reckless disregard for the truth is governed by a subjective standard that asks "'whether the affiant in fact entertained serious doubts as to the truth of the affidavit[] or had obvious reasons to doubt the accuracy of the information contained therein.'" *United States v. Cican*, 63 Fed. Appx. 832, 835 (6th Cir. 2003) (quoting *United States v. Johnson*, 78 F.3d 1258, 1262 (8th Cir. 1996)). Reckless disregard for the truth may be "infer[ed] . . . from circumstances evincing obvious reasons to doubt the veracity of the allegations." *Cican*, 63 Fed. Appx. at 837 (internal quotations omitted).

---

[6] The Government argues that there is a higher burden as it relates to material omissions. (D.E. 137 at 12 (citing *United States v. Fowler*, 535 F.3d 408, 415 (6th Cir. 2008); *United States v. Graham*, 275 F.3d 490, 506 (6th Cir. 2001).) However, the Sixth Circuit noted in a recent opinion that there appears to be inconsistency in the Circuit's precedent about the standard required to be entitled to a *Franks* hearing regarding omissions:

> [W]e have repeatedly held that a defendant must meet a "higher" standard to invalidate a warrant based on an omission (rather than a false statement). *United States v. Neal*, 577 F. App'x 434, 450 (6th Cir. 2014) (quoting *United States v. Fowler*, 535 F.3d 408, 415 (6th Cir. 2008)); *see, e.g., United States v. Fisher*, 824 F. App'x 347, 353-54 (6th Cir. 2020); *United States v. Alford*, 717 F. App'x 567, 570 (6th Cir. 2017); *United States v. Martin*, 920 F.2d 393, 398 (6th Cir. 1990). When describing this higher standard, we have sometimes noted that a defendant must prove that an officer omitted the information "with an intention to mislead" (not just with recklessness) and that the omission of the information was "critical to the finding of probable cause[.]" *Mays v. City of Dayton*, 134 F.3d 809, 816 (6th Cir. 1998); *see Hale v. Kart*, 396 F.3d 721, 726-27 (6th Cir. 2005). Other times, though, we have suggested that the defendant must show that the officer omitted the information intentionally or with reckless disregard. *See United States v. Graham*, 275 F.3d 490, 506 (6th Cir. 2001); *United States v. Atkin*, 107 F.3d 1213, 1217 (6th Cir. 1997). If the latter rule applies, it is unclear how we have set a "higher" standard for omissions than the one that governs false statements (as we have said).

> *United States v. Davis*, 84 F.4th 672, 681-82 (6th Cir. 2023), *reh'g en banc denied*, No. 22-3603, 2024 U.S. App. LEXIS 269 (6th Cir. 2024).

In considering Defendant Pettigrew's instant Motion, the Court will apply the "knowing[] and intentional[], or with reckless disregard for the truth" standard as originally outlined in *Franks*. This is, in part, due to the above quoted language that questions whether there *is* a higher standard for omissions at all and what that higher standard might mean in practice.

Once the preliminary showing is established, "the court must consider the affidavit including the omitted portions and determine whether probable cause still exists." *Id*. (citing *Bonds*, 12 F.3d at 568 n.26. Omissions that change the probable cause determination are material; omissions that do not change the probable cause determination are immaterial. Immaterial omissions are insufficient to warrant suppression under *Franks*. *Bennett*, 905 F.2d at 934. If the court finds that there is still probable cause, the inquiry ends. *Id*.

However, if the court finds that there is *not* probable cause when the omitted facts are included, then the defendant is entitled to a "full evidentiary hearing . . . ." *Bonds*, 12 F.3d at 568 n. 26. "At the hearing, the defendant must show 'by a preponderance of the evidence, that [statements were omitted] either intentionally or with reckless disregard for the truth and that with[] these statements there is insufficient content in the affidavit to support a finding of probable cause.'" *Id.* (quoting *Bennett*, 905 F.2d at 934)). In short, "the court must . . . consider the affidavit including the omitted portions and determine whether probable cause exists."[7] *Atkin*, 107 F.3d at 1217. If the court finds probable cause does *not* exist, then the evidence seized by the deficient warrant should be suppressed. Because *Leon*'s good faith exception (as outlined below) does not apply to a finding of a *Franks* violation, suppression is the end of the inquiry. *United States v. Abernathy*, 843 F.3d 243, 257 (6th Cir. 2016) ("[T]he good-faith exception does not apply when the supporting affidavit contained knowing or reckless falsity in violation of *Franks*." (internal quotation omitted)).

---

[7] Procedurally, the Sixth Circuit has noted that this process requires the parties to "start at square one again" if "the matter goes to a full evidentiary hearing[.]" *Bonds*, 12 F.3d 568, n. 26. Once an evidentiary hearing is granted, the burden is more onerous than the initial offer of proof—the defendant must establish by a preponderance of the evidence that law enforcement did, in fact, intentionally or recklessly omit information, that when included, shows that the warrant lacks probable cause. *Bonds*, 12 F.3d at 568 n. 26.

Courts are cautioned, however, that "an affidavit which omits potentially exculpatory information is less likely to present a question of impermissible official conduct than one which affirmatively includes false information." *Id*. "This is . . . because an allegation of omission potentially opens officers to endless conjecture about investigative leads, fragments of information, or other matter that might, if included, have redounded to defendant's benefit." *Id*. When preparing search warrants, officers are not required to "include in an affidavit every piece of information gathered in the course of an investigation." *Mays*, 134 F.3d at 815. At later stages in a criminal proceeding, due process rights implicate the government's duty to produce exculpatory evidence. *Id*. at 816. At the search warrant stage, courts should consider only whether the omitted material alters the probable cause determination. *Id*.

### B. The Probable Cause Standard

"[T]he Fourth Amendment treats the home as 'first among equals.'" *United States v. Reed*, 993 F.3d 441, 447 (6th Cir. 2021) (quoting *Florida v. Jardines*, 569 U.S. 1, 6 (2013)). As such, it protects against government intrusion into a citizen's home without a warrant that establishes probable cause, "supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. A finding of probable cause is supported by showing a "substantial basis for concluding that a search would uncover evidence of wrongdoing." *Illinois v. Gates*, 462 U.S. 213, 236 (1983) (cleaned up).

"Probable cause is defined as 'reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion.'" *United States v. King*, 227 F.3d 732, 739 (6th Cir. 2000) (quoting *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990)). As stated in *Illinois v. Gates*, "the probable-cause standard is . . . a practical, nontechnical conception." 462 U.S. at 231 (internal quotation omitted). Whether there is sufficient probable cause contained in a search

warrant and supporting affidavit is judged on the totality of the circumstances; great deference "should be paid" to the issuing magistrate's determination. *Gates*, 462 U.S. at 231, 236. However, "[s]ufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions or others." *Id*. at 239. Outside of the *Franks* context, when courts review a warrant for sufficiency of the evidence supporting probable cause, the review "is limited to the information presented in the four-corners of the affidavit." *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005).

Although there is no probable cause formula, there are certain guideposts in determining what a search warrant must include. As it relates to "hearsay information from a confidential informant, 'a court must consider the veracity, reliability, and the basis of knowledge for that informant as part of the totality of the circumstances . . . ." *Frazier*, 423 F.3d at 532. Where an affidavit includes no "indicia of the informants' reliability, courts insist that the affidavit contain substantial independent police corroboration." *Id*. (collecting cases). In practice, this means that "an affidavit including a tip from an informant that has been proven to be reliable may support a finding of probable cause in the absence of any corroboration." *United States v. Woosley*, 361 F.3d 924, 926-27 (6th Cir. 2004). However, if an affidavit includes "little information concerning an informant's reliability," there may still be a substantial basis for a finding of probable cause where (1) the informant provides an "explicit and detailed description of alleged wrongdoing" based on firsthand observation; or (2) law enforcement is able to independently corroborate the informant's tip. *United States v. Sonagere*, 30 F.3d 51, 53 (6th Cir. 1994) (cert. denied) (citing *Gates*, 462 U.S. at 234, 244); *see also Woosley*, 361 F.3d at 927. In the context of drug trafficking investigations, "independent corroboration may be established . . . by a police monitored, controlled purchase . . . ." *United States v. Gunter*, 266 Fed. Appx. 415, 417 (6th Cir. 2008).

The Sixth Circuit recently highlighted the "two competing principles" related to the next guidepost: *the nexus requirement*.[8] At times, courts have held that "[t]here must be 'a nexus between the place to be searched and the evidence to be sought.'" *Frazier*, 423 F.3d at 532 (quoting *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc)). This requirement is based on the idea that "probable cause to arrest a suspect for a crime does not necessarily create probable cause to search the suspect's home." *United States v. Reed*, 993 F.3d 441, 444 (6th Cir. 2021), *reh'g en banc denied*, No. 20-5631, 2021 U.S. App. LEXIS 12927 (6th Cir. 2021), *cert. denied*, 142 S. Ct. 289 (2021). This has created a body of jurisprudence that establishes "officers need additional evidence of a 'nexus' between the drug dealing and the dealer's home." *Reed*, 993 F.3d at 444 (citing *United States v. Brown*, 828 F.3d 375, 383-84 (6th Cir. 2016)).

However, there is a separate body of cases that addresses the competing principle: "the probable-cause test allows officers to make common-sense conclusions about where people hide things." *Id*. As such, "evidence of a drug dealer's ongoing drug activity can sometimes create this nexus to search the dealer's home." *Id*. (citing *United States v. Sumlin*, 956 F.3d 879, 886 (6th Cir. 2020)). The Sixth Circuit summarized the competition as such: a person's "status as a drug dealer, standing alone," is not sufficient to establish probable cause to search their home; however, there is a "reasonable . . . assum[ption] that a person keeps his possessions where he resides." *Reed*, 993 F.3d at 447-48 (quoting *Peffer v. Stephens*, 880 F.3d 256, 270 (6th Cir. 2018)). The outcome is a

---

[8] The undersigned notes here that much of the discussion of the law in *United States v. Reed* is likely dicta; the Court ultimately made its decision on the basis of a *Leon* good-faith exception—not whether the warrant provided sufficient probable cause. *Reed*, 993 F.3d at 454. However, the review of the Circuit's precedent regarding the nexus requirement is certainly applicable to this case.

"fine line[] between cases with little to distinguish those that find probable cause from those that do not."[9] *Id*. at 447.

In reviewing the case law that falls on either side of the aforementioned fine line, the Sixth Circuit made the following "fact-specific" observations. *Id*. at 448. There is probable cause to search a home when: (1) "the police watched the suspect leave a home, undertake a drug deal and return there;" (2) "drugs were found in the drug dealer's car near the home;" (3) "a suspect caught with drugs lied about his home address;" (4) "a suspect's drug dealing is ongoing at the time the police seek the warrant;" and (5) "an officer identifies recent, reliable evidence of drug activity[.]" *Reed*, 993 F.3d at 448 (collecting cases) (quotations omitted).

On the opposite side of the fine line, the Court noted that there is *not* probable cause to support a search warrant of a drug dealer's home in the following contexts: (1) "the officer's affidavit showed that the suspect had engaged in, at most, one drug transaction;" (2) "the affidavit described stale drug activity from a significant time ago;" (3) "the affidavit failed to show that the relevant home belonged to a drug dealer;"[10] (4) the "defendant was not a known drug dealer and

---

[9] The Court noted as well, that there have been "several recurring factors" that guide "[w]hether the police may 'infer a nexus between a suspect and his residence[.]'" *Id*. at 447 (quoting *United States v. Williams*, 544 F.3d 683, 687 (6th Cir. 2008)). Those factors are: "the type of crime being investigated, the nature of the things to be seized, the extent of an opportunity to conceal the evidence elsewhere and the normal inferences that may be drawn as to likely hiding places." *Id*. (quoting *Williams*, 544 F.3d at 687).

[10] In a recent, unpublished opinion, the Sixth Circuit held that a warrant failed to establish probable cause because there was no "direct connection" made between the suspected drug dealer and the residence to be searched. *United States v. Westley*, No. 22-3356, 2023 U.S. App. LEXIS 22357, at *19 (6th Cir. 2023). The Court stated that the following was included in the affidavit: "one controlled buy, drug residue found in the trash at the . . . [r]esidence, a law enforcement database matching [the defendant] with the . . . [r]esidence, the officer's experience that drug dealers store weapons and drugs in a residence near the site of their sale," and the defendant's criminal history and active arrest warrants. *Westley*, 2023 U.S. App. LEXIS 22357, at *20. The Court then stated that "[t]he criminal history and active arrest warrant merely establish that [the defendant] was engaged in drug trafficking activity." *Id*. It, instead, read the affidavit to show that "the only evidence provided that the defendant lived at the residence or used the residence for his drug activity, are the purported law enforcement database search, the officer's observation of [the defendant] leaving the residence for the controlled buy, and the trash pull." *Id*.

The Court took issue with the fact that the database was not named, and that such a statement was "conclusory and vague . . . ." *Id*. The Court also took issue with the observation by law enforcement that the

may have possessed drugs only for personal use;" and (5) a defendant "had been described as a drug dealer only by an unreliable informant[.]" *Reed*, 993 F.3d at 449 (collecting cases) (quotations omitted).

### C. *Leon*'s Good Faith Exception

The remedy available to a criminal defendant who was subjected an unconstitutional search or seizure is for the court to apply the judicially created exclusionary rule. *United States v. Leon*, 468 U.S. 897, 906 (1984). The purpose of the rule is not to right a wrong, as "[t]he wrong condemned by the [Fourth] Amendment is fully accomplished by the unlawful search or seizure itself . . . ." *Leon*, 897 U.S. at 906 (internal quotation omitted). Instead, it is meant to "deter police misconduct rather than to punish the errors of judges and magistrates." *Id*. at 916.

As such, there are situations in which courts will *not* apply the exclusionary rule, instead allowing evidence seized during a later-determined unconstitutional search into a criminal proceeding. *Id*. at 910-913. One such exception, established in *Leon*, is the good-faith exception. *Id*. at 913. The Court reasoned that "[b]ecause a search warrant provides the detached scrutiny of a neutral magistrate . . . great deference" should be accorded "to a magistrate's determination." *Id*. at 914 (internal quotations omitted). "[W]here the officer's conduct is objectively reasonable" in relying on the search warrant, "'excluding the evidence will not further the ends of the exclusionary rule in any appreciable way[.]'" *Id*. at 919-20 (quoting *Stone v. Powell*, 428 U.S. 465, 539-40 (White, J., dissenting). "[T]herefore, . . . the exclusionary rule generally should not apply when

---

defendant left the residence because "the officer did not aver that [the suspect] had been carrying any objects in his hands from the house to the car that would indicate that items related to the drug sale would be located in the . . . [r]esidence." *Id*. at *21-22. Finally, the Court reiterated that "'trash pull evidence, standing alone, is insufficient to create probable cause to search a residence[.]'" *Id*. at *23 (quoting *United States v. Abernathy*, 843 F.3d 243, 253 (6th Cir. 2016)). In short, the Court found the warrant and affidavit failed to establish probable cause because "there [was] no link between the . . . [r]esidence and [the defendant], which would indicate that the residue found in the trash [was] connected to his drug trafficking. Finding that such a connection is unnecessary is far too broad of an interpretation of probable cause." *Id*. at *24.

14

officers obtain a warrant from a neutral judge." *Reed*, 993 F.3d at 450. "The showing required to establish that reliance was 'objectively reasonable' is less than the 'substantial basis' showing required to establish probable cause." *United States v. Hython*, 443 F.3d 480, 484 (6th Cir. 2006) (quoting *United States v. Carpenter*, 360 F.3d 591, 595 (6th Cir. 2004) (en banc)).

However, there are "several circumstances in which officers would be sufficiently blameworthy to trigger the exclusionary rule despite a judge's warrant . . . ." *Reed*, 993 F.3d at 450. The good-faith exception to the exclusionary rule will *not* apply when:

> (1) the magistrate [judge] was misled by information in the affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth;
> (2) the magistrate [judge] abandoned his judicial role or neutrality;
> (3) the warrant was so lacking in indicia of probable cause as to render official belief in its existence unreasonable; or
> (4) the warrant was so facially deficient that it could not reasonably be presumed valid.
>
> *United States v. Hodson*, 543 F.3d 286, 292 (6th Cir. 2008) (internal quotations omitted).

At issue in this case is the third exception to good faith under *Leon*.[11] An affidavit that is "'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable'" is known as a "bare-bones affidavit]" *Reed*, 993 F.3d at 450 (quoting *Leon*, 468 U.S. and 923)). Such an affidavit "shows that the officer recklessly relied on the judge's decision that probable cause existed for the warrant." *Reed*, 993 F.3d at 450. Generally, a bare-bones affidavit is "one that states only 'suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding the veracity, reliability, and basis of knowledge.'"

---

[11] Defense counsel noted the search warrant at issue here identified Defendant via a hand-written note at the top, as the typed portion identified an individual who is *not* Defendant Pettigrew. The fourth exception to *Leon*'s good faith application is limited to "failing to particularize the place to be searched or the things to be seized" as itemized in the Fourth Amendment. *Leon*, 468 U.S. at 924. "[S]earch warrants are directed not at persons, but at property . . . ." *United States v. Sawyers*, 127 Fed. Appx. 174, 179 (6th Cir. 2005) (citing *Mays v. City of Dayton*, 134 F.3d 809, 814 (6th Cir. 1998)). Because the search warrant *did* properly identify the place to be searched—the West Van Hook address—and the things to be seized—evidence of methamphetamine sales and possession, the Court will not consider the fourth exception to *Leon*. (D.E. 129-2 at 1.)

*United States v. White*, 874 F.3d 490, 496 (6th Cir. 2017) (quoting *Laughton*, 409 F.3d at 748). A fair framing of the question is "whether the . . . 'reasonably well trained officer' in the field, upon looking at th[e] warrant, would have realized that the search described . . . did not match the probable cause described . . . ." *United States v. Hodson*, 543 F.3d 286, 293 (6th Cir. 2008).

However, an "affidavit will avoid the bare-bones label" —in the context of a nexus challenge— "so long as it identifies a 'minimally sufficient nexus'" between the place to the searched and the suspected drug activity. *Reed*, 993 F.3d at 450 ("*Leon*'s good-faith exception extends to [the] . . . nexus question.") (citing *Carpenter*, 360 F.3d at 596; *McCoy*, 905 F.3d at 416; *Jenkins*, 743 F. App'x at 645). The Sixth Circuit has "described a minimally sufficient nexus as one in which there is 'some connection, regardless of how remote it may have been—some modicum of evidence, however slight—between the criminal activity at issue and the place to be searched.'" *Reed*, 993 F.3d at 451 (quoting *McCoy*, 905 F.3d at 416). That nexus, however slight, must still be based on "particularized facts that indicate veracity, reliability, and basis of knowledge and go beyond bare conclusions and suppositions." *United States v. McPhearson*, 469 F.3d 518, 526 (6th Cir. 2006).

When considering good faith, the Sixth Circuit has held that "'the good faith exception to the exclusionary rule does not permit consideration of information known to a police officer, but not included in the affidavit, in determining whether an objectively reasonable officer would have relied on the warrant.'" *United States v. Helton*, 35 F.4th 511, 522 (6th Cir. 2022) (quoting *Laughton*, 409 F.3d at 752). As such, "the good faith analysis [is] based on what was contained in

the search warrant affidavit."[12] *Helton*, 35 F.4th at 522; *United States v. Waide*, 60 F.4th 327, 342 (6th Cir. 2022).

### III. ANALYSIS

#### A. *Franks* Analysis

The first decision before the Court was whether Defendant made a sufficient preliminary showing that SA Williams' omissions amounted to a deliberate falsehood or reckless disregard for the truth that would entitle Defendant to a *Franks* hearing. After reviewing the parties' briefs and associated exhibits, the Court heard testimony from the CS, Defense counsel's investigator, and briefly from the Defendant. The parties presented argument regarding whether the omissions were material—whether when included, the search warrant and affidavit still made a showing of probable cause. The Court determined that there were material omissions that likely reached the level of a reckless disregard for the truth. (Tr. p. 63-64.) As such, the Court held a *Franks* hearing. Once the *Franks* hearing commenced, SA Williams was called to the stand to testify. The Court heard his testimony and the parties' remaining argument.

Since the preliminary showing was made and a *Franks* hearing held, the next step is determining whether Defendant established, by a preponderance of the evidence, that SA Williams

---

[12] The Court notes here that limiting the analysis of good faith to the four corners of the affidavit is the general rule, with some exceptions. *United States v. Frazier*, 423 F.3d 526, 533-34 (6th Cir. 2005) ("[W]e do not read *Laughton* as prohibiting a court in all circumstances from considering evidence not included in the affidavit."). The Sixth Circuit has, at times, looked beyond the four corners of a warrant affidavit in light of *Leon* where it is clear the issuing magistrate was aware of additional information, despite that information not making its way into the warrant affidavit. *Frazier*, 423 F.3d at 533-34; *Reed*, 993 F.3d at 453.

The Sixth Circuit in *United States v. Hython*, however, held that the exception highlighted in *Frazier* did *not* apply where the government attempted to rely on an "implicit[] indicat[ion]" that the warrant complied with temporal proximity but failed to "indicate an awareness on the part of the issuing magistrate of the timing of the controlled buy." 443 F.3d 480, 488 (6th Cir. 2006). Thus, where there is nothing to establish that the magistrate was made aware of additional facts that support a showing of probable cause—either by contemporaneously filed affidavits or sworn testimony by the law enforcement officer—then the general rule of evaluating good faith only via the four corners of the affidavit applies. *See United States v. Davis*, 84 F.4th 672, 680 (6th Cir. 2023) (collecting cases) ("When engaging in the *Leon* inquiry, we will not rely on information known only to the officer (and not the magistrate).")

omitted facts from the affidavit either intentionally or with reckless disregard for the truth. Then, the Court must read those omitted facts into the affidavit to determine whether there was still probable cause to support issuing the warrant.

**1. Reckless Disregard for the Truth**

This section will detail the following omissions and whether the Court finds they were omitted with a reckless disregard for the truth. Those omissions are: (1) failing to include information about the CS's veracity, reliability, or basis of knowledge; (2) characterizing Mr. Huey as an "unwitting party" and failing to include information about his veracity, reliability, or basis of knowledge and; (3) failing to disclose the length of time that elapsed—and the additional stop—between picking Mr. Huey up and arriving at Defendant's address. (D.E. 129 at 6-7.)

**a. The Veracity, Reliability, or Basis of Knowledge of the Confidential Source**

SA Williams' affidavit stated that a Confidential Source was utilized in the course of the investigating the Defendant. The following exchange took place at the *Franks* hearing regarding the CS's history serving as a confidential informant:

> **[Government Counsel]:** Do you recall how you came about recruiting [the CS] as a confidential source?
>
> **[SA Williams]:** I do. We stopped a vehicle in the north end of Gibson County that day, I believe July 8th. She was a passenger in the vehicle. The driver was arrested. She was a passenger, as I said, and had some narcotics on her. She agreed to try to work for the drug task force in lieu of going to jail right then. So we give [sic] her that opportunity.
>
> **[Government Counsel]:** Did you – walk me through what you did to kind of give her the rules and regulations of being a confidential source.
>
> **[SA Williams]:** So we finished up on the side of the road, obviously, and went to our office in Humboldt, and went over the rules of being a [confidential informant] for the West Tennessee Drug Task Force. I'm not sure if she signed the packet or not that day. But all [confidential informants] are told up front, you can't use narcotics while working for the West Tennessee Drug Task Force. You can't trade sex for narcotics while working for the Drug Task Force. You can't carry a firearm while working for the Drug Task Force. It goes through several rules.

(Tr. 68, ¶¶ 8-25; 69, ¶¶ 1-6.)

Regarding the reliability of the CS, the following exchange took place at the hearing:

**[Defense Counsel]** Okay. Also when asked about this whole unreliable—why in the world would you put unreliable in? And you explained that. So if, for example, at that time, you know, you hadn't worked with her. [CS] had come up to you and told you, [defense counsel] is selling a lot of dope. You would [have] considered her unreliable because you hadn't had any dealing with her. Is that right?

**[SA Williams]** That's correct.

**[Defense Counsel]** Okay. So basically at that time she was an unreliable source. Because that was the first day you ever met her.

**[SA Williams]** That's correct.

**[Defense Counsel]** You didn't think that was—strike that. But you chose to refer to her as a confidential source or a CS.

**[SA Williams]** That's correct.

(Tr. 103, ¶¶ 19-25; 104, ¶¶ 1-11.)

The Court notes two key pieces of information from the above testimony. First, the CS was enlisted to assist in the investigation that led to Defendant's arrest on the *same day* she was stopped and found to be in possession of narcotics. She was so new to the concept of being a CS that SA Williams is unsure as to whether she had signed the requisite paperwork prior to being sent out into the field to participate in an investigation. Second, SA Williams testified that he found her to be unreliable.

SA Williams did not disclose any of this information to the issuing magistrate. While he was not required, necessarily, to use an adjective like "unreliable," he gave absolutely no information that would have allowed the issuing magistrate to make his own, independent determination about whether the CS was reliable or not. This requirement, that an affidavit "include[e] the 'veracity' and 'basis of knowledge' of persons supplying hearsay information," is

not a requirement for the sake of burdening with law enforcement with more paperwork. *Gates*, 462 U.S. at 238. It is to ensure that the issuing judicial officer can "make a practical, common-sense decision . . . given *all* the circumstances set forth in the affidavit before him[.]" When law enforcement fails to include sufficient details about a confidential source, that denies the magistrate the ability to consider all of the circumstances, which the Supreme Court announced includes an informant's reliability, veracity, and basis of knowledge just over forty years ago. *Id*.

In comparing his testimony with the lack of information in the affidavit, the Court is left with one conclusion: SA Williams had obvious reasons to doubt the accuracy of the information contained therein. SA Williams believed the CS was unreliable, but withheld the details regarding her reliability, veracity, and basis of knowledge; this prevented the issuing judge from reaching the same conclusion. The Court can also infer SA Williams' recklessness from the fact that including details about an informant or confidential source's experience and track record working with law enforcement is, at this point, a standard practice in search warrant applications because of *Illinois v. Gates* and its progeny. With twenty years of experience in law enforcement, SA Williams certainly must be aware of the importance an informant's credibility when it comes to building probable cause.

The Court reads SA Williams' failure to include these unfavorable facts about this CS's credibility as reckless disregard for the truth because SA Williams went on to testify that he was relying on the CS's later statements to law enforcement to establish probable cause. (Tr. 90, ¶¶ 12-20.) If SA Williams had included the facts known to him about the CS, the issuing judge may have concluded she was unreliable, just as SA Williams had. However, because SA Williams was relying upon her statements (as he had no other independent corroboration) that Defendant Pettigrew had provided Mr. Huey with the methamphetamine, he needed the issuing judge to not question the

CS's veracity, reliability, or basis of knowledge. That he did not include the unfavorable facts about this CS's credibility—facts known to him—leads the Court to conclude he acted with reckless disregard for the truth.

### b. Mr. Huey as an "Unwitting Party" and His Veracity, Reliability, and Basis of Knowledge

As to how Mr. Huey was identified to the issuing magistrate, SA Williams testified that Mr. Huey was the intended target of the investigation for which the CS was enlisted to assist. (Tr. 15, ¶¶ 18-19; 77, ¶ 10-13.) SA Williams plainly stated that "Mr. Huey was the one [he] was trying to arrest." (Tr. 88, ¶ 19.) Defense counsel asked if, "at any point" prior to the stop at the Budget Inn, law enforcement "let [Mr. Huey] know that [they] had been watching him?" (Tr. 83, ¶¶ 23-24.) SA Williams testified: "No." (Tr. 83, ¶ 25.) SA Williams further stated that, to his knowledge, Mr. Huey "had no clue about the operation[.]"[13] (Tr. 84, ¶¶ 1-4.)

Technically speaking, the Court agrees with SA Williams that Mr. Huey was an "unwitting party" in that he was unaware that he was the target of an investigation that day. However, SA Williams withheld from the issuing judge that Mr. Huey was *more* than an unwitting party—he was the original target of the investigation. This characterization walks an incredibly fine line between something that is technically truthful but certainly not the *whole* truth.

The Court has frequently seen applications for search warrants that indicate while investigating one person, a second person is implicated in the criminal activity. It is through the course and scope of investigating the first person that law enforcement develops facts to support a warrant as to the second. This is perfectly understandable and appropriate.

---

[13] Defense counsel called his private investigator as a witness, who spoke with Mr. Huey prior to the hearing. According to the investigator, Mr. Huey reported that "[h]e did not know . . . it was a controlled buy." (Tr. 38, ¶¶ 23-24.)

So why did SA Williams choose to describe Mr. Huey as an "unwitting party" instead of presenting something to the effect of "through the course and scope of investigating Mr. Huey," Defendant Pettigrew became a person of interest? The Court can only infer that this omission is because SA Williams was relying on Mr. Huey's later statement that he obtained the methamphetamine from Defendant to establish probable cause. (Tr. 89, ¶¶ 2-23; 90, ¶¶ 4-20.) As with the CS, including the unfavorable facts about Mr. Huey's true relationship to this investigation would potentially cause the issuing judge to disagree about whether there was probable cause because SA Williams had no other independent corroboration of the drug sale. SA Williams' failure to include the facts known to him about Mr. Huey's reliability and relationship to the investigation leads the Court to conclude he acted with reckless disregard for the truth.

### c. Omitting Information About the Length of Time, and Additional Stops, Between Picking Mr. Huey Up and Arriving at West Van Hook

When asked why he did not "include this idea that this operation went on for hours and hours," SA Williams testified that he "didn't see that it was needed." (Tr. 97, ¶¶ 9-11.) In his "eyes, that's when [they were] trying to arrest Dylan Huey, and this search warrant [was] for [Defendant Pettigrew]." (Tr. 97, ¶¶ 12-13.) Developing probable cause as to Defendant, according to SA Williams, "didn't take but a few minutes. They went in and come [sic] out." (Tr. 97, ¶¶ 16-17.)

Regarding the intervening stop at Mr. Huey's grandparent's house, SA Williams testified he didn't disclose this information in the supporting affidavit because he "didn't feel like it was needed for the probable cause" as to Defendant Pettigrew, and he was concerned about protecting the CS's identity. (Tr. 85, ¶¶ 5-13.)

He also testified that he did not include this information, in part, because he "felt like that's—she was there under control of us. We was [sic] watching her. She didn't get no dope [sic]

from that address."[14] (Tr. 88, ¶ 5-7.) SA Williams testified that if the CS had physically gone into Mr. Huey's grandparent's house the case would not have gone forward because they "would have lost control of the situation." (Tr. 76, ¶ 20.) According to SA Williams, after law enforcement searches a confidential source, they "don't allow [a confidential source] to go into the gas station or any other residence, because [they] feel like [they] would lose control over that situation with [their] money and the search of [a] vehicle." (Tr. 76, ¶¶ 21-25; 77, ¶ 1.)

Regarding law enforcement not searching Mr. Huey prior to him joining the CS in her car or after he went into his grandparent's home, the following testimony is relevant. Defense counsel asked SA Williams why law enforcement searched the CS and her car prior to sending her to pick up Mr. Huey. (Tr. 88, ¶¶ 9-10.) He replied, "[f]or the integrity of the case." (Tr. 88, ¶ 14.) SA Williams acknowledged that he had "no idea whether [Mr. Huey] had drugs on him the whole time or not" because Mr. Huey was not searched prior to entering Defendant's trailer. (Tr. 88, ¶¶ 18-23.)

The Court finds that on its own, omitting the length of time the investigation took is not a great cause of concern. However, the Court is greatly concerned with the fact SA Williams did not include the stop prior to going to the West Van Hook address. He testified that he included only those facts he felt he needed to establish probable cause as to Defendant Pettigrew. In doing so he presented a set of facts that do not paint a complete picture of the facts of the investigation.

While law enforcement officers are not required to present exculpatory information, they *are* required to present an honest account of their investigation. SA Williams presented facts that

---

[14] The cross-examination of SA Williams went on to reveal that because Mr. Huey was not searched prior to entering the CS's vehicle, law enforcement could not verify he did not have methamphetamine on him from the beginning. (Tr. 88, ¶¶ 19-24.) The Court deduces from this testimony that SA Williams thinks the CS did not obtain the 3.5 grams of methamphetamine from Mr. Huey until they stopped at the West Van Hook address. However, the only evidence to support that belief is what Mr. Huey and the CS reported when stopped by law enforcement at the Budget Inn.

amount to a reckless disregard for the truth because he failed to include a significant detail regarding Mr. Huey and the CS's activities: the stop at Mr. Huey's grandparents' house.

The undersigned reaches this conclusion by looking at the timeline SA Williams presented to the issuing judge. SA Williams' account of the investigation in the affidavit does not begin with the CS and Mr. Huey arriving at Defendant Pettigrew's house. It begins with law enforcement searching the CS. It then accounts for the CS picking up Mr. Huey. It is silent on their stop at the grandparents' house. It picks up with their arrival at the West Van Hook address.

SA Williams testified that he is aware that the integrity of a case is important—the search of a source, their vehicle, and any additional stops they make have an impact on the investigation. He testified that the reason law enforcement searches a CS and their vehicle before a controlled buy is to ensure there is no contraband evidence. He testified that if the CS had gone into the grandparents' house, they would have lost control of the investigation. SA Williams also testified that Mr. Huey had *not* been searched prior to entering the CS's vehicle, and he agreed on cross examination that Mr. Huey "could have . . . had drugs with him from the jump start." (Tr. 88, ¶ 25, 89, ¶ 1.)

The Court reads SA Williams' testimony to mean that he is well-aware that in order to conduct a meaningful controlled buy, law enforcement must be able to ensure that the buy is, in fact, controlled. There must be confirmation that no contraband evidence is present on the person cooperating or in their vicinity. The movement of the person participating in the buy must be closely monitored and controlled to minimize the opportunity for contraband to enter the scene other than from the person selling the illegal substance. And then the cooperating buyer must be searched again after the buy so law enforcement can collect the evidence. SA Williams' testimony evidences his awareness of why these steps are important, and why an issuing judge would want

to know if any of them were missing or if there were any irregularities—because it would indicate a lack of control over the situation.

And yet, SA Williams failed to disclose a significant irregularity: the stop and Mr. Huey's grandparents' home. SA Williams' knowledge of the importance of *control* in a "controlled buy," coupled with his failure to report to the magistrate an element that indicated a lack of control, leads the Court to conclude that this omission was a reckless disregard for the truth.

### 2. Once the Omitted Facts are Included, is the Warrant Still Supported by Probable Cause?

The next question is whether, after including the omitted facts, the warrant is still supported by probable cause. The Court finds that it is not. This analysis focuses on a totality of the circumstances that there is a fair probability contraband evidence would be found at the West Van Hook address.

Were the Court to draft an amended affidavit, it would read as follows:

1. Law enforcement engaged a confidential source to investigate Mr. Huey. That confidential source is of unknown veracity or reliability as she has not previously worked as a confidential source. Law enforcement believed her to have some basis of knowledge regarding Mr. Huey as a drug dealer because she was, at that time, an active drug user. Law enforcement searched the CS and her vehicle prior to engaging in the investigation. It was confirmed she had no contraband evidence. Law enforcement supplied the CS with $200 in buy money.

2. The CS was directed to engage with Mr. Huey, which she did. The CS went to pick Mr. Huey up. The pair drove to Mr. Huey's grandparent's home where they stayed for several hours. Mr. Huey went into the home. The CS remained outside in her car under the constant surveillance of law enforcement.

3. Mr. Huey then reported to the CS that Charles Pettigrew was willing to sell them methamphetamine. At that point, the investigation shifted to include Mr. Pettigrew as a person of interest. The pair then drove to an address at 4065 West Van Hook Street in Milan, Tennessee 38358. Officers observed Mr. Huey enter the trailer at that location. A short time later he emerged and got back in the CS's car.

4. At the direction of law enforcement, the CS instructed Mr. Huey to go to a nearby Budget Inn. Law enforcement conducted a traffic stop at that location. They recovered 3.5 grams of a substance that field tested positive for methamphetamine from Mr. Huey, and an additional 3.5 grams from the CS.

5. After being read his Miranda rights, Mr. Huey stated that he purchased the methamphetamine from Charles Pettigrew at the West Van Hook address. The CS reported that Mr. Huey told her he purchased the methamphetamine from Charles Pettigrew. The CS also reported that Charles Pettigrew came out to her vehicle after he made the deal with Mr. Huey and stated to her to holler at him tomorrow if this CS needed any more methamphetamine.

6. Agents with the Drug Task Force have received multiple tips from other law enforcement agencies, to include the Tennessee Bureau of Investigations and the Milan Police Department, about Charles Pettigrew selling methamphetamine in Milan, TN.

7. Charles Pettigrew has been convicted of multiple felonies that include Schedule II drugs on 01/01/1994, Schedule II drugs on 07/20/1997, Schedule II Drugs (meth) on 12/05/2107 all out of Gibson County, TN.

Reading these facts together, the Court finds that there is not probable cause. First and foremost, Mr. Huey was not searched prior to entering the investigation, so there is no assurance that he did not arrive on the scene without drugs on his person. Second, there are *two* locations from which the drugs could have been obtained if Mr. Huey did not already have them: the Huey grandparent house or the West Van Hook address. Weighing probabilities, then, there were three potential locations from which the methamphetamine could have come.

Third, law enforcement relied entirely on the hearsay statements of an unreliable CS and an unreliable person of interest that the methamphetamine came from Defendant at the West Van Hook address. The Court does not use the term unreliable despairingly; the CS herself testified that she was an active drug user at that time, and it is clear from the evidence before the Court that

Mr. Huey was, too. She was untested as a CS and had no track record of success—neither did Mr. Huey.

When it comes to the hearsay statements of unreliable informants, there must be sufficient corroboration of the information provided. However, no such corroboration is included in this affidavit. There was no independent corroboration that Defendant in fact lived at that address or was at that address. While SA Williams later testified that he saw Defendant come out of the trailer and speak with the CS, that information is not in the original affidavit. The Court is not certain, even if it were, that such an observation would be sufficient to meaningfully tie Defendant to that address. The tips from other law enforcement agencies and unreliable informants don't help because there still is not any independent corroboration that Defendant lived at the West Van Hook address, which was the place to be searched. Certainly, Defendant has a criminal history, however the most recent conviction is nearly seven years old.

In short, what should have been placed before the issuing judge amounted to this: law enforcement watched a brand-new CS pick up Mr. Huey, go to his grandparent's house, go to 4065 West Van Hook, and then the Budget Inn. They recovered 3.5 grams of methamphetamine from the CS and Mr. Huey, who both reported the methamphetamine was purchased from Defendant at the West Van Hook trailer. The CS was searched prior to the buy; Mr. Huey was not. Law enforcement did not observe the buy, did not listen to the buy, and has not independently confirmed that Defendant lives at that address. Defendant has been previously convicted of drug-related crimes.

The totality of the circumstances is this: the probable cause analysis that there would be contraband evidence *at the place to be searched* relied on the un-corroborated testimony of two unreliable, active drug users (one of whom likely wanted to deflect any suspicion away from

himself and his grandparent's home). If the Fourth Amendment is to mean anything, it must mean more than this.

The Court therefore, **RECOMMENDS GRANTING** Defendant's Motion to Suppress pursuant to *Franks*; there were material omissions from the affidavit that amount to a reckless disregard for the truth, and when including the omitted facts, the warrant lacks probable cause.

### B. Probable Cause Analysis Absent *Franks*

In reviewing the search warrant and affidavit, the Court is also convinced that absent a *Franks* analysis, the warrant lacks probable cause on its face. Looking at the affidavit, considering only the information contained in its four corners, the Court finds that probable cause was largely based on hearsay information provided by two informants: the CS and Mr. Huey. First, Mr. Huey reported to the CS (who in turn, reported to law enforcement) that they could buy methamphetamine from Defendant Pettigrew. Then, officers relied on the statements of Mr. Huey after the take-down that he did purchase methamphetamine from Defendant Pettigrew. They also relied on the statement of the CS that Mr. Huey purchased methamphetamine from Defendant Pettigrew.

Not considering any of the omitted information, the Court still observes a complete lack of information about the informants' veracity, reliability, and very little information about their basis of knowledge. As to veracity, at most the Court can agree that law enforcement followed the pair to the West Van Hook address, which the informants said belonged to Defendant and where they later said Mr. Huey bought the methamphetamine. However, there is nothing in the affidavit (and apparently nothing in the investigation) that verifies Defendant, in fact, lived at that address or that Mr. Huey did obtain the methamphetamine there.

As to reliability, there is no information about whether the informants have proven to be reliable in the past, or why law enforcement believed them to be reliable in the course of this

investigation. Finally, as to basis of knowledge, the Court notes that the CS was *not* in the trailer at the time the alleged drug deal took place. Her basis of knowledge, then, is the exact same as law enforcement's: she believed Defendant sold Mr. Huey methamphetamine because Mr. Huey said so.

SA Williams testified that he corroborated the information provided by Mr. Huey. The Court disagrees. SA Williams attempted to paint a picture to the issuing judge that, at some level, the investigation included a controlled buy. Controlled purchases of illegal substances are sufficient to corroborate an otherwise unreliable informant's tip. *Gunter*, 266 Fed. Appx. at 417. Had law enforcement searched Mr. Huey prior to him entering the investigation, the Court would agree this sequence of events was a controlled buy, and thus sufficient to cure the lack of information about the CS and Mr. Huey's reliability. However, since law enforcement did not search Mr. Huey, there is no corroboration that Mr. Huey purchased the drugs from Defendant—there is just Mr. Huey's word for it. Absent a recording of the transaction, or a search of Mr. Huey prior to him entering the trailer, at most all the Court can say is that SA Williams observed Mr. Huey's movements but did nothing to *corroborate* his later-told story.

There is an additional, issue with the affidavit—it fails to establish a nexus between the place to be searched and the evidence to be sought. As outlined above, there is competing precedent about whether a defendant's status as a drug dealer, alone, is sufficient to establish probable cause.[15] Taking the more lenient standard first that would allow law enforcement to rely on a

---

[15] The Court notes here that these competing standards relate, in large part, to what a law enforcement officer may conclude based on their training, experience, and largely a dose of common sense. While the Court does not place a great amount of weight upon the following, it identified a discrepancy even in the details regarding SA Williams' training and experience versus the evidence sought in the instant warrant.

The warrant sought authorization to search for evidence that included documents, drugs, drug paraphernalia, currency, cell phones, and other computerized records related to the "possession and selling of illegal Schedule II *Methamphetamine*." (D.E. 129-2 at 1 (emphasis added).) Yet the details about SA Williams' training and

suspect's status as a drug dealer to establish probable cause, the Court finds that the affidavit is lacking in a significant way: nothing in the affidavit establishes that Defendant Pettigrew lived at the West Van Hook address. Although SA Williams apparently saw Defendant Pettigrew come out of the trailer, that information (1) was not in the affidavit and (2) is insufficient to establish that Defendant *lived* in the trailer.

The Court notes, when looking at the affidavit under the standard that there must be an additional nexus to tie the drug transaction to that address, several other problems arise. First, as outlined in *Reed*, the affidavit shows that Defendant "engaged in . . . one drug transaction." *Reed*, 993 F.3d at 449. Second, the Affidavit "failed to show that the relevant home belonged to the [alleged] drug dealer." *Id*. Finally, the affidavit largely rested on information provided by an informant with no verification of his reliability. *Id*.

Reading the affidavit with these things in mind, law enforcement presented the issuing judge with the following facts: (1) an informant (Mr. Huey) told a CS that they could purchase drugs from Defendant; (2) the CS and her car had been searched, but the informant had not; (3) the informant and CS went to a trailer on West Van Hook St.; (4) law enforcement observed the informant enter the trailer; (5) the CS remained outside the trailer; (6) after observing the informant exit the trailer, law enforcement conducted a take down and recovered methamphetamine from

---

experience focused on how drug traffickers utilize electronic devices, electronic communications, telephones, and social media applications to facilitate sales and drug trafficking conspiracies. (D.E. 129-2 at 4, ¶ 1.) His pedigree statement addressed his experience with investigation drug-related crimes, generally, but also included that he is aware of certain practices "[b]ased on [his] training, experience, and participation in the investigation of organizations and individuals involved in the distribution of *marijuana* . . . ." (D.E. 12-2 at 5, ¶ 2 (emphasis added)).

SA Williams testified that he likely edited a previous search warrant and affidavit in order to prepare the one before the Court. The Government would likely, again, call this a scrivener's error. It is clear to the Court that SA Williams failed to update what was likely a previous affidavit seeking access to, or control of, electronic devices related to the sale of marijuana. This of course, was an application to search a home for evidence of methamphetamine sales. Again, this discrepancy is not fatal to the probable cause analysis, but it minimizes the Court's ability to rest much of the probable cause finding on SA Williams' own training and experience as courts have done in the past. *Reed*, 993 F.3d at 447-48.

both the CS and the informant; (7) the informant said he purchased the methamphetamine from Defendant; (8) the CS said the informant also told her he purchased the methamphetamine from Defendant; (9) at an unreported time, unreliable informants and unnamed law enforcement agencies indicated Defendant was selling drugs; (10) Defendant has a history of drug-related felonies, the most recent of which was from 2017.

The Court is cautious to read the affidavit and search warrant with the due deference to the issuing judge. However, there are certain issues deference simply cannot overcome. There is nothing to establish the veracity, reliability, or basis of knowledge as to the CS. There is nothing to establish the veracity or reliability of Mr. Huey; the only fact establishing his basis of knowledge is that he admitted to purchasing the drugs from Defendant. There is no independent corroboration by law enforcement that the drug sale took place because Mr. Huey was not searched prior to going into the trailer, nor was the sale recorded. There is no independent corroboration by law enforcement that Defendant Pettigrew lived at the West Van Hook address. While the Affidavit made mention of other tips as to Defendant Pettigrew selling drugs, those tips came from admittedly unreliable sources or unnamed agencies without any reference to how old those tips might be. Finally, the Court is cautious to include a seven-year-old drug conviction as a significant-enough fact to tip the scales in favor of a finding of probable cause. For the aforementioned reasons, even weighing the warrant with the appropriate deference owed the issuing magistrate, the undersigned **RECOMMENDS** finding that the warrant failed to establish probable cause to search the West Van Hook address.

### C. *Leon*'s Good Faith Exception

The more difficult question is whether the warrant and evidence seized from its execution should be suppressed pursuant to the exclusionary rule, whether *Leon*'s good faith exception

applies, or whether there is an exception to *Leon*. As previously noted, the exception to *Leon* present here is whether the warrant is "so lacking in indicia of probable cause as to render official belief in its existence unreasonable[.]" *Hodson*, 543 F.3d at 292 (internal quotation omitted).

This affidavit falls within the bare-bones definition because probable cause was built upon "suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding the veracity, reliability, and basis of knowledge." *White*, 874 F.3d at 496 (internal quotations omitted). As detailed above, there is insufficient information presented in the affidavit to establish the veracity, reliability, and basis of knowledge of the CS and Mr. Huey as it relates to this alleged drug sale. Also, as detailed above, there is absolutely no independent corroboration by law enforcement that the sale, in fact, took place at the West Van Hook address or that Defendant lived at that address.

Yet, the affidavit can avoid the bare-bones label if there is a minimally sufficient nexus or "some connection, regardless of how remote it may have been . . . between the criminal activity at issue and the place to be searched." *Reed*, 993 F.3d at 451. The criminal activity here is the sale of methamphetamine. The connection between that activity and the West Van Hook trailer is this: law enforcement observed a person, who was later found to be in possession of methamphetamine, go into the West Van Hook trailer and exit a short time later. That person said he purchased methamphetamine in the trailer. Perhaps this is a minimally sufficient nexus, but that nexus must still be based on "particularized facts that indicate veracity, reliability, and [a] basis of knowledge . . . ." *McPhearson*, 469 F.3d at 526. As detailed previously, there is nothing to indicate Mr. Huey's veracity or reliability. As such, the Court concludes there is no minimally sufficient nexus to save the affidavit from being the kind of bare-bones documentation that no reasonable officer would rely upon.

Because the Court finds the warrant and supporting affidavit lack probable cause, and the third exception to *Leon* applies, the warrant should be **SUPPRESSED**, and the evidence obtained in execution of that search should be **EXCLUDED**.

### IV. CONCLUSION

For all these reasons, the Magistrate Judge recommends that this Court **GRANT** Defendant's Motion to Suppress.

Respectfully submitted this 29th day of August, 2024.

<u>s/Jon A. York</u>
UNITED STATES MAGISTRATE JUDGE


**ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT AND RECOMMENDATION MUST BE FILED WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT AND RECOMMENDATION. 28 U.S.C. § 636(b)(1). FAILURE TO FILE THEM WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OR FORFEITURE OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.**